# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JOHNNY S.,** *by and through his parents*
*and next friends next friends*
**DARLENE R.** *and* **JUAN S.**

      Plaintiffs,

     vs.                            **No. 1:13-CV-00027-MCA-KBM**

**POJOAQUE VALLEY SCHOOL**
**DISTRICT,** *et al.*

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *Defendants' Motion for Judgement on the Pleadings and For Qualified Immunity and Memorandum in Support Thereof* [Doc. 37] and the parties *Joint Motion to Consolidate and For Further Relief as Described Herein* [Doc. 34].  Having considered the submissions, the relevant case law, and otherwise being fully advised in the premises, the Court grants in part and denies in part *Defendants' Motion for Judgement on the Pleadings and For Qualified Immunity and Memorandum in Support Thereof* [Doc. 37] and denies the *Joint Motion to Consolidate and For Further Relief as Described Herein* [Doc. 34].

## I.    BACKGROUND

On September 4, 2012, Plaintiff, Johnny S., by and through his parents and next friends Darlene R. and Juan S., filed *a Complaint for Civil Rights Violations, Disability*

*Discrimination, and Negligence* in the First Judicial District of the State of New Mexico.

[Doc. 1-3]  Defendants, Pojoaque Valley School District, the Board of Education for the

Pojoaque Valley School District, Adan Delgado, Hoyt Mutz, Diana Quintana, and Norma

Cavazos (hereinafter collectively referred to as "Defendants") removed the case to this

Court on the basis of federal question jurisdiction.  [Doc. 1]

The Complaint alleges the following relevant facts.  Johnny is an eighteen year old

student who is in the 12th grade at Pojoaque Valley High School.  [Doc. 1 at 3]  Johnny is

eligible for special education on the bases of multiple disabilities, including severe

epilepsy and mental retardation.  [Id.]  Defendants developed an Individualized

Education Plan (IEP) for Johnny that required him to have a 1:1 educational and safety

assistant at all times while at school.  Additionally, Defendants suggested that Johnny use

a wheelchair when moving around the school to prevent injury in the event of a seizure.

[Id. at 4]

On September 9, 2010,

> an untrained educational assistant escorted Johnny from
> school to his father's car.  Contrary to Johnny's IEP, the
> educational assistant had another disabled student with him.
> The educational assistant walked in front with the other
> disabled student, with Johnny walking behind the educational
> assistant.  As a result, the educational assistant was not giving
> any attention to Johnny, as also required by Johnny's IEP.  In
> the absence of the safety assistance required by his IEP,
> Johnny had a seizure and fell to the ground, landing on his
> face and shoulder. As a result of the chain of events put in
> motion by the District and the individual Defendants, the
> educational assistant had not been trained or even informed
> regarding Johnny's special needs or his Health Care Plan, and
> as a result did not know how to respond to Johnny's seizure.
> Johnny was taken to a local hospital by ambulance and

> received medical treatment for severe cuts, abrasions, and
> injury to his face, head and shoulder.

[Id. at 4-5]

Following the September 5, 2010 incident, Defendants delayed developing a

Health Care Plan, training staff and securing an educational assistant, which caused

Johnny to miss weeks of school.  At some point, a 2010 to 2011 Health Care Plan was

developed for Johnny.  The 2010 to 2011 Health Care Plan

> provided directions for first aid during seizures,
> documentation of seizures in a seizure log and supervision
> and safety measures to prevent falls and other injuries.  The
> Plan specifically required that Johnny would wear a fitted
> helmet with a face guard at school and would be in his
> wheelchair while at school except when the District's
> Physical Therapist was working with him.  The Plan also
> required that supervision be no more than arm's length away.

[Id. at 7]

On October 24, 2011, Johnny was at school when he stood up, had a seizure and

fell, hitting the back of his head on the floor.  Johnny was transported to the hospital

where he received medical treatment and twelve staples in the back of his head.  At the

time of the incident, there was no education assistant in the room with Johnny or adult

supervision within arm's length reach.  Additionally, Johnny was not wearing his helmet

and was not harnessed in his wheelchair.  [Id. at 7-8]  After the October 24, 2011 fall,

Johnny missed approximately six weeks of school.

Plaintiff's Complaint raises three causes of action: (1) violation of the New

Mexico Tort Claims Act, NMSA 1978, § 41-4-6, which waives the state's sovereign

immunity for "damages resulting in bodily injury, wrongful death or property damage

caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings" against all Defendants; (2) violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 against the school district; and (3) deprivation of due process of law in violation of 42 U.S.C. § 1983 against all Defendants.

On May 10, 2013, Defendants filed *Defendants' Motion for Judgement on the Pleadings and For Qualified Immunity and Memorandum in Support Thereof* [Doc. 37]. In their Motion, Defendants seek judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), arguing that: (1) Plaintiff's Complaint states a claim for negligent supervision, negligent hiring or training, and negligence per se, all of which are barred by the New Mexico Tort Claims Act; (2) this Court lacks jurisdiction over Plaintiff's New Mexico Tort Claims Act claim because Plaintiff failed to plead that tort claims notice had been provided to Defendants; (3) Plaintiff has failed to plead sufficient facts in support of his disability discrimination claim; (4) Plaintiff's Section 504 and ADA claims are barred because they are duplicative of his Individuals with Disabilities Act (IDEA) claim or, alternatively, because he failed to exhaust his administrative remedies; (5) Plaintiff's Section 1983 claim must fail because he was not deprived of a constitutionally protected property right; (6) Plaintiff's complaint fails to state a claim for supervisory liability or failure to train under Section 1983; (7) Defendant Delgado should be dismissed because all claims against him are duplicative of the claims against the District; and (8) Defendants Mutz, Quintana and Cavazos are entitled to qualified immunity because

Plaintiff was not deprived of a constitutional right and, even if he was, the right was not clearly established.  On June 17, 2013, this Court granted Defendants' unopposed motion to stay proceedings in the present case pending resolution of the qualified immunity issue.  [Doc. 52]

On May 10, 2013, the parties also filed a *Joint Motion to Consolidate and For Further Relief as Described Herein*.  [Doc. 34]  In their joint motion, the parties seek to consolidate the present case with Plaintiff's IDEA appeal in *Johnny S. v. Pojoaque Valley School District, et al.*, 13-CV-145 RHS/ACT, since the two cases involve common questions of law and fact, as well as common parties.  However, on July 8, 2013, Plaintiff withdrew his consent to the joint motion.  [Doc. 57]  Plaintiff opposes consolidation because he does not want the stay imposed in the present case to delay proceedings on his administrative IDEA appeal.

## II.  STANDARD

Fed. R. Civ. P. 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  "Judgment on the pleadings is appropriate only when the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." Sanders v. Mountain America Federal Credit Union, 689 F.3d 1138, 1141 (10th Cir. 2012) (internal quotation marks and citation omitted).   In ruling on a motion for judgment on the pleadings under Rule 12(c), the Court applies the standard applicable to a motion to dismiss under Rule 12(b)(6).  Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1160 (10th Cir. 2000).

Under Fed. R. Civ. P. 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  The sufficiency of a complaint is a question of law, and when considering and addressing a motion to dismiss pursuant to rule 12(b)(6), a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006).  Further, in order to withstand a rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citation omitted) (Iqbal).  If a plaintiff cannot nudge the claims "across the line from conceivable to plausible," the complaint must be dismissed.  Id. at 680.

In handing down Twombly, the United States Supreme Court invalidated the longstanding rule that a complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  The Conley standard has proved problematic over the years because it suggests that "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery."  Twombly, 550 U.S. at 561 (quoting

Conley, 355 U.S. at 45-46).  As a result, defendants may be forced to bear the burden and

expense of discovery before they are afforded a real opportunity to seek the dismissal of

groundless claims, while plaintiffs may use the burdensome discovery process as

leverage to induce otherwise unjustified settlement of such groundless claims.  See

Twombly, 550 U.S. at 557-59.

A complaint is now subject to dismissal under the new standard if it does not

"possess enough heft to 'sho[w] that the pleader is entitled to relief.'"  Twombly, 550

U.S. at 557 (quoting Fed. R. Civ. P. 8(a)(2)). In other words, "the mere metaphysical

possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded

claims is insufficient; the complaint must give the court reason to believe that *this*

plaintiff has a reasonable likelihood of mustering factual support for *these* claims."

Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007).

> Two "working principles" underlie the Twombly standard. Iqbal, 556 U.S. at 678.
> First, the tenet that a court must accept as true all of the allegations
> contained in a complaint is inapplicable to legal conclusions.  Threadbare
> recitals of the elements of a cause of action, supported by mere conclusory
> statements, do not suffice. . . . Second, only a complaint that states a
> plausible claim for relief survives a motion to dismiss.  Determining
> whether a complaint states a plausible claim for relief will . . . be a context-
> specific task that requires the reviewing court to draw on its judicial
> experience and common sense.

Id. at 678-79 (internal citations omitted).  Thus, in order to evaluate a motion to dismiss,

the Court engages in a two-part inquiry by initially identifying those allegations that are

nothing more than legal conclusions and therefore "not entitled to the assumption of

truth" and then considering whether the factual allegations "plausibly suggest an

entitlement to relief."  Id. at 681.

## III.   DISCUSSION

### A.   *New Mexico Tort Claims Act*

The New Mexico Tort Claims Act "grants all government entities and their employees general immunity from actions in tort, but waives that immunity in certain specified circumstances." Upton v. Clovis Mun. Sch., 141 P.3d 1259, 1261 (N.M 2006). Section 41-4-6 waives the state's sovereign immunity for "damages resulting in bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings."

### 1.   *Notice*

"The Tort Claims Act requires a tort victim to give a written notice of claim within 90 days after an occurrence giving rise to the claim as a condition precedent to an action under that Act." Godwin v. Mem'l Med. Ctr., 25 P.3d 273, 280 (N.M. App. 2001); see NMSA 1978, § 41-4-16 ("Every person who claims damages from the state or any local public body under the Tort Claims Act shall cause to be presented to . . . the superintendent of the school district for claims against the school district . . . within ninety days after an occurrence giving rise to a claim for which immunity has been waived under the Tort Claims Act, a written notice stating the time, place and circumstances of the loss or injury."). "This notice-of-claim requirement operates as a statutory limitations period and failure to file a timely notice of claim is a statutory bar to suit." Godwin, 25 P.3d at 280. However, notice-of-claim is not required when "the governmental entity had actual notice of the occurrence" § 41-4-16(B).

8

Plaintiff's Complaint alleges that "Defendants had timely actual and constructive notice of the time, place and circumstances of the incidents and likelihood that litigation would ensue against Defendants." [Doc. 1-3 at 17-18] Defendants contend that this allegation is insufficient to demonstrate compliance with the notice required under the Tort Claims Act and, therefore, "Plaintiff's claims brought under the TCA must be dismissed for lack of subject matter jurisdiction." [Doc. 37 at 16] In his response Plaintiff attached various documents to establish that Defendants had actual and constructive notice of the facts underlying Plaintiff's claim: (1) a report dated September 9, 2010 that was submitted to the New Mexico Public Schools Insurance Authority by Diana Quintana documenting Johnny's fall in the parking lot on that date; (2) a letter dated October 5, 2010 to Adan Delgado from Teresa Maestas "DD Waiver Case Manager" discussing the details surrounding Johnny's fall on September 9, 2010 and Defendants' response; (3) a report dated October 24, 2011 that was submitted to the New Mexico Public Schools Insurance Authority by Diana Quintana and Erica Roybal documenting Johnny's fall in school on that date; and (4) a letter dated March 7, 2012 from Jeanette Chavez, Sr., Claims Specialist at the New Mexico Public Schools Insurance Authority, which references Plaintiff's Tort Claims Notice dated November 7, 2011. [See Docs. 53-2 to 53-4]

As a preliminary matter, the Court must determine whether it may consider the documents attached to Plaintiff's response. "Generally, the sufficiency of a complaint must rest on its contents alone." Gee v. Pacheco, 627 F.3d 1178, 1186 (10th Cir. 2010). There are exceptions to this restriction on what the court can consider, but

> they are quite limited: (1) documents that the complaint incorporates by reference, (2) documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity, and (3) matters of which a court may take judicial notice . . .

Id. (internal quotation marks and citations omitted).  "If a district court intends to rely on other evidence, it must convert the Rule 12(b)(6) motion to a motion for summary judgment, giving proper notice to the parties. See Fed. R. Civ .P. 12(d)."  Id.

The documents attached to Plaintiff's response are not incorporated into the Complaint by reference, they are not referred to in the complaint or central to Plaintiff's claims and they are not matters of which the Court may take judicial notice. Accordingly, the Court will not consider these materials.

Turning to the allegations in the Complaint, Plaintiff alleges that "Defendants had timely actual and constructive notice of the time, place and circumstances of the incidents and likelihood that litigation would ensue against Defendants."   Although it is unclear precisely how Defendants were provided with "timely actual and constructive notice of the time, place, and circumstances" of Johnny's falls, it is apparent, based on the allegations contained in the complaint, that Defendants had actual knowledge of these incidences and their severity.  For example, the Complaint alleges that Johnny fell to the ground and was injured when, contrary to his IEP, he was not within arm's length reach of a trained assistant.  An ambulance was summoned and Johnny missed several weeks of school.  Defendants convened a meeting at which "the IEP team recommended that Johnny use the wheelchair when moving around the school and that he would be supervised within arm's length at all times."  [Doc. 1-3 at 5]  Additionally, "the District

advised Johnny's parents that a Health Care Plan would be developed and staff would be trained by Defendant Quintana to ensure Johnny's safety upon his return to school."  [Id.] Like his first fall, Johnny's second fall took place on school premises and an ambulance was summoned.  Contrary to the Health Plan, Johnny was not within arm's length reach of an adult, he was not wearing a helmet and he was not harnessed in his wheelchair.  As a result, Johnny received 12 staples in his head and missed six weeks of school.

"[A]ctual notice for purposes of the Tort Claims Act means actual notice of the tort."  Lopez v. State, 930 P.2d 146, 149 (N.M. 1996).  Additionally, "Section 41-4-16(B) contemplates that the state must be given notice of a likelihood that litigation may ensue."  Id. at 150 (internal quotation marks and citation omitted).  In determining whether notice was sufficient, the Court must examine the totality of the circumstances to determine whether "from the circumstances known to the government entity charged with fault in the occurrence, a reasonable person would have concluded that the victim may claim compensation."  Id.  Thus, "actual notice is a jurisdictional question and separate from the ultimate issue of liability, whether the facts give rise to a reasonable inference that a claim may be filed is a threshold inquiry to be resolved by the court."  Id. at 151.

Although Defendants had actual notice of Johnny's falls and their severity, it is unclear whether this notice was sufficient to apprise Defendants of the likelihood that litigation may ensue.  In Lopez, the New Mexico Supreme Court held that a factual question existed regarding the sufficiency of actual notice because the agency allegedly at fault had prepared an accident report that contained a high level of factual detail—including the severity of the plaintiff's injuries, the fact that she was taken to the hospital,

the existence of a "watch your step" sign, and a list of witnesses—indicating that a claim might be filed.  Therefore, an evidentiary hearing was required "to decide the threshold issue whether, from actual notice of the occurrence, [the defendant] was on notice that it may be subject to claim."  Id. As in Lopez, Defendants in this case allegedly were aware of the factual details surrounding Johnny's falls, their severity, and the lack of compliance with Johnny's IEP. Therefore, the Court concludes that a factual question exists regarding whether Defendants were on notice that they may be subject to claim. Because "[j]udgment on the pleadings is appropriate only when the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law," Sanders, 689 F.3d at 1141 (10th Cir. 2012), the Court concludes that Defendants are not entitled to judgment on the pleadings on Plaintiff's New Mexico Tort Claims Act claim based on the alleged failure to provide timely notice.

> ### 2.    _Waiver of Immunity_

Defendants next contend that Plaintiff's claim is barred by the New Mexico Tort Claims Act because Plaintiff's Complaint states a claim for negligent supervision, negligent hiring or training, and negligence per se.  To resolve this issue, the Court must closely examine New Mexico case law interpreting the waiver of immunity contained in Section 41-4-6.

In Upton v. Clovis Municipal School District, a fourteen-year old student, Sarah, died as a result of an asthma attack at school.  The school was aware of Sarah's severe asthma and had agreed to limit Sarah's physical exercise if she felt it was triggering an

attack.  On the day in question, however, a substitute physical education teacher forced

Sarah to engage in strenuous exercise.  When Sarah asked for permission to stop, the

teacher refused.  Afterward, Sarah went to class and collapsed at her desk.  Although the

teacher called the front desk and a secretary checked Sarah's vital signs, no one ever

administered CPR or any other emergency protocol.  Sarah was placed in a wheelchair in

the hallway.  A police officer saw Sarah and immediately called 911.  When medical

personnel arrived, Sarah was no longer breathing and attempts to revive her were

unsuccessful. 141 P.3d at 1260.

      Sarah's parents sued the school and the New Mexico Supreme Court held that:

> the School District's alleged failure to follow procedures for
> at-risk students appears to fall comfortably within the Section
> 41-4-6 waiver for "operation or maintenance" of a public
> building.  Just as schools generally have safety procedures in
> place for various kinds of emergencies, a school simply
> cannot operate in a safe, reasonable and prudent manner
> without affording, at the very least, the health and safety
> services that students have been promised, and upon which
> parents have relied.  Safety procedures are particularly vital
> for those students known to have special needs and special
> risks.  In this instance, the School District's failures to
> comply with such protocols and assurances created a
> dangerous condition . . . .
>
> The procedures in place for students with special needs like
> Sarah are akin to other measures that are important for the
> safe operation of any school building.  For example, schools
> put in place fire plans to expedite a safe exit from the
> building.  In the operation of the school, the threat of fire is
> treated in a specific manner, just as students with special
> health needs are treated in a specific way for their own safety.
> If a fire were to break out and school personnel were to fail to
> respond in a reasonable manner, then few would question that
> the school was negligent in the "operation" of the school
> building within the meaning of the TCA. Sarah's situation

> draws close parallel.  The School District failed to follow
> through on its safety policies for students with special needs
> and students in acute medical distress, an act of negligence in
> the operation of the school no less portentous to its students
> than a failure to implement appropriate fire exit procedure.

Id. at 1262-63.

The Court recognized "that a complaint alleging nothing more than negligent supervision is not actionable, because the TCA does not specify a tort waiver for negligent supervision." Id. at 1263.  However, the Court determined that "[t]he Uptons clearly assert much more than negligent supervision of their daughter" because they "challenge the School District's general failure to implement promised safety procedures for at-risk students."  Id. In arriving at this conclusion the Court distinguished between the cases involving only a 'discrete administrative decision' that did not make the premises any more dangerous beyond 'the reasonable and expected risks . . .' and the cases demonstrating 'a general condition of unreasonable risk from negligent security practices,' for which the TCA does waive immunity."  Id. (quoting Archibeque v. Moya, 866 P.2d 344, 350 (N.M. 1993) (Ransom, J., specially concurring); compare Archibeque, 866 P.2d at 618 (holding that immunity was not waived when a prison administrator negligently failed to check a list for names before placing an inmate into an area of the prison with his known enemies), with Callaway v. New Mexico Dep't of Corrections, 875 P.2d 393 (N.M. App. 1994) (holding that immunity was waived when prison officials allowed violent gang members to mingle with the general prison population, thereby creating a dangerous condition based on more than just a single administrative decision affecting only one inmate)

Although the alleged dangerous condition must affect the general public and not only a single person, the Court clarified that the term "general public" does not refer to "the entire public, but rather, at least potentially, to the class of people that use the building or facility in question."  Upton, 141 P.3d at 1264.  "The key point . . . is that the negligence must be of a kind which makes the premises dangerous, or potentially so, to the affected public, the consumers of the service or the users of the building, including the plaintiff."  Id. at 1265.  Although only Sarah was injured in Upton, the Court held that the danger posed was to a group of people using the school.

> Failure to respond appropriately to an emergency medical situation is a potential threat to every student in school because such a situation can occur at any time, regardless of special health needs.  The school's indifference towards Sarah's special medical needs makes it more likely that all similarly situated students were at risk as well.  The same policies that led the Uptons to rely on the school's diligence were in place for other at-risk students.  This is not a case of action uniquely affecting only one student.  The school's failures, if proven, created a dangerous condition for all special-needs children, and with regard to emergency responsiveness, for every student at the school.

Id.  Accordingly, the Upton's negligence claim fell within the waiver of immunity set forth in Section 41-4-6; see also Leithead v. City of Santa Fe, 940 P.2d 459 (N.M. 1997) (holding that the negligent provision of lifeguard services at a public pool constituted a dangerous condition that fell within the waiver of sovereign immunity set forth in Section 41-4-6); Bober v. New Mexico State Fair, 808 P.2d 614, 623 (N.M. 1991) (holding that a high volume of cars exiting the state fair parking lot constituted a dangerous condition on the land that fell within the waiver of sovereign immunity set forth in Section 41-4-6);

Castillo v. County of Santa Fe, 755 P.2d 48, 51 (N.M. 1988) (holding that wild roaming dogs constituted a dangerous condition that fell within the waiver of immunity set forth in Section 41-4-6).

In Encinias v. Whitener, 310 P.3d 611 (N.M. 2013), the New Mexico Supreme Court again addressed the scope of the waiver of immunity set forth in Section 41-4-6.  In Encinias, the plaintiff, Joe Robert Encinias, was injured by another student off school property, but on a street the school had cordoned off so that students could patronize food vendors there.  Id. at 614.  The Court noted that it must "interpret Section 41-4-6(A) broadly to waive immunity where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government."  Id. at 616-17 (internal quotation marks and citation omitted).  The Court noted that "[w]hile one student's battery of another would not generally waive a school's immunity under Section 41-4-6(A), a school's failure to address a pattern of student violence in a particular area might create an unsafe condition on the premises."  Id. at 618.  The "failure to address a pattern of violence is *not* merely failure to supervise."  Id.  "Just as businesses must exercise reasonable care to discover and prevent dangerous conditions caused by people on their premises . . . so must the government."  Id. at 618-19.  The Court held that the assistant principal's statement that the area where the attack occurred was "hot zone" for student violence was "enough to raise questions about the degree of student violence and the school's efforts to discover and prevent student violence in that area."  Id. at 619.  Therefore, Encinias had "established a genuine issue of material fact as to whether there was a dangers condition

on the premises of the high school" pursuant to Section 41-4-6(A).  Id.

In the present case, the parties dispute whether Plaintiff's Complaint states a claim for the negligent supervision of Johnny, a claim which is barred by Section 41-4-6, or whether it states a claim for the negligent maintenance or operation of a condition dangerous to the general public, a claim for which sovereign immunity is waived under Section 41-4-6.  Plaintiff's Complaint alleges that "Defendants and their employees operated the school in a manner that created unsafe and dangerous conditions on the school grounds for students with special needs."  [Doc. 1-3 at 14]  Specifically, "Defendants' systemic negligence in failing to design and implement safety protocols that took the safety and health of special needs students into account, created a condition on the school grounds that affected or potentially affected special needs students as a class of persons using the school."  [Id. at 16]  Defendants' alleged acts and omissions, which are discussed in the background section above, "created a foreseeable risk that a health emergency such as a seizure and subsequent fall would occur" and "combined to create a dangerous condition that placed Johnny in a worse position than the reasonable and expected risks of school life."  [Id. at 17]  The Complaint further alleges that "[t]he school's indifference towards Johnny's special medical needs made it more likely that all similarly situated students with special needs and students in need of school nursing were at risk as well."  [Id.]

As in Upton, Defendants' alleged "failure to follow procedures for at-risk students appears to fall comfortably within the Section 41-4-6 waiver for 'operation or maintenance' of a public building."  Upton, 141 P.3d at 1262.  Defendants were aware of

Johnny's special needs and had an IEP and Health Plan in place to protect Johnny's health and well-being.  As the Supreme Court observed in Upton, "a school simply cannot operate in a safe, reasonable and prudent manner without affording, at the very least, the health and safety services that students have been promised, and upon which parents have relied.  Safety procedures are particularly vital for those students," like Johnny, "known to have special needs and special risks."  Id.  Defendants' alleged failure "to comply with such protocols and assurances create[s] a dangerous condition . . ." Id. Although, as in Upton, only one student was injured, the dangerous condition created by Defendants was not limited to a single student, but allegedly "affected or potentially affected special needs students as a class of persons using the school."  [Doc. 1-3 at 16] Because the facts alleged in the Complaint fall within the purview of the waiver contained in Section 41-4-16, Defendants' motion for judgment on the pleadings will be denied with respect to Plaintiff's New Mexico Tort Claims Act claim.

      B.      *Section 504 and ADA claims*

        Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "To state a claim under Section 504, a plaintiff must prove (1) that he is a 'handicapped individual' under the Act, (2) that he is 'otherwise qualified' for the [benefit] sought, (3) that he was [discriminated against] solely by reason of his handicap, and (4) that the program or activity in question receives federal financial assistance."  Cohon ex rel. Bass

v. New Mexico Dep't of Health, 646 F.3d 717, 725 (10th Cir. 2011) (internal quotation marks and citation omitted).

Title II of the ADA[1] provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. "To state a claim under Title II, the plaintiff must allege that "(1) [s]he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." Cohon ex rel. Bass, 646 F.3d at 725 (internal quotation marks and citation omitted).

Section 504 of the Rehabilitation Act and the ADA "involve the same substantive standards" and, therefore, the two statutes are analyzed together. Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Sch., 565 F.3d 1232, 1245 (10th Cir. 2009).

   *1. Otherwise Qualified*

Defendants contend that Plaintiff was not otherwise qualified to receive the special education benefits and services that were allegedly denied to him. Defendants point out that "Plaintiff at bar is only entitled to the special education benefits and services he claims was denied *because* of his disability" and, therefore, argue that he was not otherwise qualified to receive these benefits and services *despite* his disability. [Doc. 37

---

[1] It is unclear whether Plaintiff's ADA claim is premised on Title II or Title III. However, Title III of the ADA does not provide for compensatory damages, which Plaintiff seeks in his Complaint, and therefore, the Court construes the Complaint as stating a claim under Title II of the ADA. See 42 U.S.C. § 12188(a)(1).

at 27 (emphasis added)]  Plaintiff responds that "special education is *not* the benefit sought" but, rather, "special education is a means to an end—the end is access to a public school education."  [Doc. 53 at 14]

Section 504 "requires that an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers."  Alexander v. Choate, 469 U.S. 287, 301 (1985); see also Johnson v. Thompson, 971 F.2d 1487, 1494 (10th Cir. 1992) ("Section 504 proscribes discrimination between the nonhandicapped and the 'otherwise qualified' handicapped.  It does not create any absolute substantive right" to benefits or services").  The benefits or services sought "cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made."  Alexander, 469 U.S. at 301; see id. at 301 n. 21 (recognizing that "[a]ntidiscrimination legislation can obviously be emptied of meaning if every discriminatory policy is 'collapsed' into one's definition of what is the relevant benefit").  Section 504, therefore, balances the "statutory rights of the handicapped to be integrated into society and the legitimate interests of federal grantees in preserving the integrity of their programs: while a grantee need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped, it may be required to make 'reasonable' ones."  Id.

In his Complaint, Plaintiff alleges that Defendants' discriminated against Johnny on the basis of his disability, resulting in the "deprivation of educational opportunity, exclusion from educational and non-academic opportunities, failing to reasonably

accommodate his disabilities, discrimination between students with disabilities and students without disabilities." [Doc. 1-3 at 18] Plaintiff further alleges that he "was denied an opportunity to participate in physical education, on the basis of his disabilities." [Id. at 19] Given the allegations contained in the Complaint, the Court concludes that the benefit sought by Plaintiff is equal access to a free public school education, not special education services. Special education services are merely sought as a reasonable accommodation of Plaintiff's disability, not as the ultimate benefit or service to which Plaintiff is entitled.

In Chavez v. Bd. of Educ. Of Tularosa Mun. Sch., No. CIV 05-380 JB/RLP, 2008 WL 4816992 (D.N.M. July 25, 2008), the Court similarly rejected an argument that the plaintiff, an autistic student, was not "otherwise qualified" under Section 504 and the ADA. The Court distinguished two of the cases relied on by Defendants, Johnson v. Thompson, 971 F.2d 1487 (10th Cir. 1992) and Baumeister v. New Mexico Comm'n for the Blind, 425 F. Supp. 2d 1250 (D.N.M. 2006), reasoning that the plaintiff "is not entitled to attend school because of his autism; he is entitled to attend school because he is a school-aged child." Id. at *18; see Johnson, 971 F.2d at (holding that infants with spina bifida were not "otherwise qualified" for medical treatment under Section 504 because their disability is what made them eligible for treatment); Baumeister, 425 F. Supp. 2d at 1266 (holding that blind plaintiffs were not "otherwise qualified" for services under Section 504 because their disability is what made them eligible for services). The Court rejected the argument that the plaintiff was requesting a special accommodation— to attend school.

> Under that logic, no person would ever be otherwise
> qualified, because the benefit would always be considered a
> special accommodation to which the person was entitled
> because of his or her disability rather than in spite of it.  For
> example, if the benefit were to attend school, as in Mathew's
> case, but the student who was entitled to attend school was
> paraplegic, and the student requested a ramp to enter the
> school, which was an accommodation to attend school, under
> the NMPED's logic, the benefit to which the student would
> be entitled would not be school attendance; the benefit would
> be the ramp.  Thus, the student would only be entitled to the
> ramp because of his or her paraplegia, not in spite of that
> disability, and would never be entitled to the benefit of
> attending school.  This rationale would prevent any person
> from ever being otherwise qualified for the receipt of a
> benefit.

Id.  "The attendance of school is not a 'special accommodation'—it is a requirement for

all school-aged students in New Mexico."  Id.

For the foregoing reasons, the Court concludes that Johnny is "otherwise

qualified" to attend school under Section 504 and the ADA.

2.    *Intentional Discrimination*

Defendants next contend that Plaintiff's Complaint fails to allege sufficient facts

in support of the element of intentional discrimination.  However, "[i]ntentional

discrimination is not an element of the Plaintiff's *prima facie* case."  Powers v. MJB

Acquisition Corp., 184 F.3d 1147, 1152 (10th Cir. 1999); see also Chavez, 2008 WL

4816992, at * 19 ("The Plaintiffs are not required to show that NMPED had a

discriminatory intent to demonstrate a violation of the Rehabilitation Act.").  As the

Tenth Circuit Court of Appeals has stated:

> It would be a rare case indeed in which a hostile
> discriminatory purpose or subjective intent to discriminate

> solely on the basis of handicap could be shown.
> Discrimination on the basis of handicap usually results from
> more invidious causative elements and often occurs under the
> guise of extending a helping hand or a mistaken, restrictive
> belief as to the limitations of handicapped persons.

Pushkin v. Regents of the Univ. of Colorado, 658 F.2d 1372, 1385 (10th Cir. 1981).

However, "to recover compensatory damages under § 504, a plaintiff must establish that the agency's discrimination was intentional." Barber v. Colorado Dep't of Revenue, 562 F.3d 1222, 1228 (10th Cir. 2009); see Powers, 184 F.3d at 1153 ("We agree with the course charted by our sister circuits and hold that entitlement to compensatory damages under section 504 of the Rehabilitation Act requires proof the defendant has intentionally discriminated against the plaintiff."). "Intentional discrimination does not require a showing of personal ill will or animosity toward the disabled person; rather, intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will result in a violation of federal protected rights." Barber, 184 F.3d at 1228-29 (internal quotation marks and citation omitted).

The Court concludes that the facts alleged in the Complaint are sufficient to demonstrate deliberate indifference. The Complaint alleges that Johnny had an IEP in place "that required him to have a 1:1 educational and safety assistant at all times at school." [Doc. 1-3 at 4] Despite the IEP, Johnny did not have a 1:1 educational assistant at the time of his first fall. Afterward, there was a revised Health Care Plan that required Johnny to wear a helmet, sit in a wheelchair, and be supervised at no more than an arm's length away from a trained assistant. Despite the Health Care Plan, Johnny was not in a

23

wheelchair, was not wearing a helmet, and was not within arm's length of a trained assistant at the time of the second fall.  As a result of both falls, Johnny missed several weeks of school.  The Complaint alleges that "Johnny's mother requested that the special education department provide homebound services during his absences" and that Defendants' were deliberately indifferent to this request.  [Doc. 1-3 at 6, 18]  The Complaint further alleges that Defendants had "knowledge of Johnny's need for extended school year services for the summer of 2011" and that they were deliberately indifferent to this need.  [Doc. 1-3 at 10, 18]  Because Defendants allegedly knew of Johnny's epilepsy and the significant injuries that he could incur in the absence of the safety procedures delineated in the IEP and Health Plan, but these safety features repeatedly were not implemented, the Court concludes that Plaintiff's Complaint states a claim for compensatory damages under Section 504 and the ADA.

> ### _3._     _IDEA_

Defendants next contend that Plaintiff's Section 504 and ADA claims state a claim for educational injury and, therefore, they are duplicative of Plaintiff's IDEA claim and must be dismissed to avoid a double recovery.  In <u>Cudjoe v. Independent School District No. 12</u>, 297 F.3d 1058, 1063 (10th Cir. 2002), the Tenth Circuit Court of Appeals held that "the language and the policy of the IDEA suggest that if a student with a disability seeks to bring a claim for educational injuries, then he must plead and show either that he has exhausted his administrative remedies under the IDEA or that the relief he is seeking is not available under the IDEA."  The Court clarified that "the IDEA's exhaustion requirement will not be excused simply because a plaintiff requests damages, which are

ordinarily unavailable in administrative hearings held pursuant to the statute . . . if his alleged injuries could be redressed under the IDEA." Id. at 1066.  Thus, the Court must focus "on whether there is any relief available under the IDEA to remedy the injury, as opposed to the particular relief sought by the plaintiff" in order "to ensure that the IDEA process is not . . . short-circuited by a rush to court seeking damages." Id. at 1067.

Defendants' contend that, even though Plaintiff's Complaint seeks compensatory damages under Section 504 and the ADA, these claims are barred because Plaintiff seeks to recover for "educational injuries."  To the extent that Plaintiff seeks to recover for "educational injuries," the Court concludes that Plaintiff's Section 504 and ADA claims are not barred because he has exhausted his administrative remedies under the IDEA. The record in Johnny's IDEA appeal, *Johnny S. v. Pojoaque Valley School District, et al.*, 13-CV-145 RHS/ACT, reflects that Johnny filed a Due Process Hearing Notice under the IDEA on April 26, 2012, and an amended Notice on August 16, 2012.  [Doc. 3-1]  The Due Process Hearing Officer (DPHO) addressed the "educational injuries" raised in Plaintiff's complaint, including but not limited to: the alleged failure to have a 1:1 educational assistant at the time of Johnny's falls, the alleged failure to implement the IEP and Health Plans, the alleged failure to provide homebound services while Johnny was recovering from his injuries, the alleged failure to provide special education services, the alleged failure to provide transition and graduation plans, the alleged failure to provide physical education services, the alleged failure to provide transportation services, and the alleged failure to provide extended school year services.  The DPHO found in favor of Plaintiff on many, but not all, of his claims and Plaintiff appealed.  Plaintiff's

appeal is currently pending in *Johnny S. v. Pojoaque Valley School District, et al.*, 13-CV-145 RHS/ACT.

Defendants next contend that Plaintiff's Section 504 and ADA claims are barred because they are duplicative of Plaintiff's IDEA claims and Plaintiff already received relief in the IDEA administrative proceedings. In support of this contention, Defendants rely on Miller v. Board of Education of the Albuquerque Public Schools, 455 Supp.2d 1286 (D.N.M. 2006). In Miller, this Court affirmed the decision issued by the DPHO and dismissed the plaintiff's Section 504 and ADA claim, which sought the same equitable relief.

> Where Section 504 and ADA claims follow on the heels of an IDEA claim in this manner, other courts have reasoned that a plaintiff "cannot establish a viable claim under the non-IDEA causes of action, where the predicate acts, upon which he has premised those claims, have withstood judicial review under the IDEA. Moubry v. Independent Sch. Dist., 696, Ely, Minn., 9 F. Supp. 2d 1086, 1108-09 (D. Minn. 1998). When the process mandated by the IDEA produces an administrative decision upheld on judicial review, "principles of issue and claim preclusion may properly be applied to short-circuit redundant claims under other laws" such as the ADA and Section 504.

Miller, 455 F. Supp. 2d at 1312-13. In Miller, this Court held that "Plaintiffs' ADA and Section 504 claims are precluded or 'short-circuited' insofar as (1) the predicate acts upon which Plaintiffs base those claims . . . are the same acts which form the basis for their IDEA claims, and (2) the AAO's decision on Plaintiff's IDEA claims has withstood judicial review in this civil action." Id. at 1313. Notably, in that case, Plaintiffs were "not seeking compensatory damages for emotional distress, pain and suffering, loss of

educational opportunity, or loss of future earning capacity."  Id. at 1315.

Miller is distinguishable from the present case, because Plaintiff's IDEA appeal is still pending and Plaintiff is seeking compensatory damages for his injuries.  With respect to Plaintiff's IDEA appeal, claim preclusion and issue preclusion are inapplicable because the predicate acts upon which Plaintiff's IDEA, Section 504 and ADA claims are based have not yet withstood judicial review.  Indeed, in Miller, this Court recognized that "principles of issue preclusion and claim preclusion do not necessarily apply to *judicially unreviewed* rulings that administrative tribunals make pursuant to the IDEA." Id. at 1313 (emphasis in original).  Accordingly, Plaintiff's Section 504 and ADA claims are not "short-circuited" by his IDEA appeal.

Defendants appear to concede this point, stating that they "do not ask at this time for the Court to consider the DPHO's finding of fact and law," but that they "do request . . . that the Court take judicial notice of the DPHO Final Decision for the limited purpose of recognizing the equitable and compensatory relief that has already been awarded to Plaintiff Johnny S."  [Doc. 37 at 30]  Under the IDEA, a plaintiff may seek "monetary awards in the form of reimbursement for services that a school wrongfully failed to provide."  Moseley v. Bd. of Educ. of Albuquerque Pub. Sch., 483 F.3d 689, 693 (10th Cir. 2007).  However, the Tenth Circuit has not yet determined whether compensatory damages are available under the IDEA.  See id. at 693 n.7 ("This court has yet to decide whether the IDEA permits compensatory damages.").  "[M]ost circuits hold that the IDEA does not permit compensatory damages" and the Tenth Circuit has indicated that it "see[s] no reason to depart from the majority view."  Id.

27

The DPHO awarded Plaintiff equitable relief and a monetary award for the "reimbursement for past transportation expenses." [Doc. 37 at 29-30] Plaintiff did not seek and the DPHO did not award Plaintiff any compensatory damages for the alleged injuries identified in his Complaint: "serious physical injury, emotional distress and mental anguish, damage to his self-esteem, and potentially irremediable developmental delays." [Doc. 1-3 at 19] As previously explained, such compensatory damages are available under Section 504 and the ADA if the Plaintiff can prove intentional discrimination. Because Plaintiff was not awarded compensatory damages on his IDEA claim, the Court concludes that the relief sought on his Section 504 and ADA claims is not duplicative of the relief awarded by the DPHO.

Defendants argue that, "even if Plaintiffs' 504/ADA compensatory damage *claims* are not precluded, a *damage award* under the circumstances is precluded as a matter of law" because "[a]s a result of the IDEA administrative process, [Plaintiff] will have been made whole for [his] educational injuries." [Doc. 55 at 8] Although the IDEA process may make Plaintiff whole for the injuries suffered under the IDEA, it does not redress Plaintiff's injuries under Section 504 or the ADA. The IDEA itself provides that nothing therein should be "construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities." 20 U.S.C. § 1415(l). Furthermore, the harms addressed by the two statutory schemes differ:

> In contrast to the IDEA, Section 504 emphasizes equal treatment, not just access to a FAPE.  In other words, the drafter of Section 504 were not only concerned with [a student] receiving a FAPE somewhere (as was the case with the IDEA), but also that a federally funded program does not treat [the student] differently because [she is disabled].  Under Section 504, a state special school cannot hide behind the justification that another public school might provide a FAPE; it must show that somehow [the student] does not qualify for admission.  Unlike the IDEA, Section 504 does not only look at what is a FAPE, but also what is fair.

Ellenberg v. New Mexico Military Institute, 478 F.3d 1262, 1281 n.22 (10th Cir. 2007) (quoting Christopher J. Walker, Note, *Adequate Access or Equal Treatment: Looking Beyond the IDEA to Section 504 in a Post–Schaffer Public School,* 58 Stan. L. Rev. 1563, 1589 (2006)").  Lastly, the damages available differ—compensatory damages are available under Section 504 and the ADA, whereas compensatory damages generally are not available under the IDEA.  Accordingly, a damage award on Plaintiff's Section 504 and ADA claim is not precluded by the Plaintiff's IDEA award

For the foregoing reasons, Defendants' motion for judgment on the pleadings of Plaintiff's Section 504 and ADA claims will be denied.

C.       *§ 1983*

Defendants next contend that Plaintiff's Section 1983 claim must fail because Plaintiff does not have a constitutionally protected property or liberty interest in the provision of special education services.  "42 U.S.C. § 1983 allows an injured person to seek damages against an individual who has violated his or her federal rights while acting under color of state law."  Cillo v. City of Greenwood Village, 739 F.3d 451, 459 (10th Cir. 2013).  The first step in assessing a Section 1983 claim "is to identify the specific

constitutional right allegedly infringed."  Myers v. Koopman, 738 F.3d 1190, 1194 (10th

Cir. 2013) (internal quotation marks and citation omitted).

    1.  Procedural Due Process

    The Due Process Clause states, "No State shall ... deprive any person of life, liberty,

or property, without due process of law." U.S. Const. amend. XIV § 1.

> An alleged violation of the procedural due process required
> by this clause prompts a two-step inquiry: (1) whether the
> plaintiff has shown the deprivation of an interest in "life,
> liberty, or property" and (2) whether the procedures followed
> by the government in depriving the plaintiff of that interest
> comported with "due process of law."

Elliott v. Martinez, 675 F.3d 1241, 1244 (10th Cir. 2012) (internal quotation marks and

citation omitted).  "A protected interest in liberty or property may have its source in

either federal or state law."  Id.

    In Goss v. Lopez, 419 U.S. 565, 574 (1975), the United States Supreme Court held

that an Ohio state law providing for a free public school education created "a legitimate

entitlement to a public education as a property interest which is protected by the Due

Process Clause and which may not be taken away for misconduct without adherence to

the minimum procedures required by that Clause."  In Goss, the plaintiff students were

suspended for ten days without a hearing prior to suspension or within a reasonable time

thereafter.  Id. at 571.  The Court held that "a 10-day suspension from school is not de

minimis . . . and may not be imposed in complete disregard of the Due Process Clause."

Id. at 576.  Accordingly, "[a]t the very minimum . . . students facing suspension and the

consequent interference with a protected property interest must be given some kind of

notice and afforded some kind of hearing." Id. at 579.

In Albach v. Odle, 531 F.2d 983, 985 (10th Cir. 1976) (per curiam), the Tenth Circuit Court of Appeals noted that "in framing the property interest the Court in Goss speaks in terms of the 'educational process.'"

> The educational process is a broad and comprehensive concept with a variable and indefinite meaning.  It is not limited to classroom attendance but includes innumerable separate components, such as participation in athletic activity and membership in school clubs and social groups, which combine to provide an atmosphere of intellectual and moral advancement.  We do not read Goss to establish a property interest subject to constitutional protection in each of these separate components.

Id.  Based on the foregoing, the Court in Albach rejected the Plaintiff's due process claim, holding that "[p]articipation in interscholastic athletics is not a constitutionally protected civil right."  Id.

In Seamons v. Snow, 84 F.3d 1226 (10th Cir. 1996), the plaintiff filed a Section 1983 claim against his school, after he was allegedly forced to transfer to a different school due to a hostile environment.  The Tenth Circuit recognized that, pursuant to Goss, the plaintiff had "a constitutionally protected interest in receiving public education," but clarified that the plaintiff did not have a constitutional right to the "particular incidents of education" that he claimed "were lost (e.g., the right to participate in sports, to take advanced placement classes, and to attend a particular school)."  Id. at 1234-35.  The Court explained that in Albach, it had interpreted Goss "to speak only in general terms regarding the 'educational process'" and that "the innumerable separate components of the educational process, such as participation in athletics and membership

31

in school clubs, do not create a property interest subject to constitutional protection." Id.

at 1235. Accordingly, the Court held that the plaintiff had "failed to allege a protectable

property or liberty interest under the Due Process Clause." Id.

In the present case, Plaintiff alleges the following in his Complaint:

> Plaintiff had and has a protected liberty and property interest
> in his public school education and the wide array of benefits
> and services that should have been made available to him,
> including an interest in a Health Care Plan to assure safe
> school environment despite his disabilities, adequate school
> nursing services, a graduation pathway plan, inclusion in
> extracurricular school activities, a physical education
> program, transition services, extended school year services,
> and homebound services when his injuries or disabilities
> prohibited his return to school.

[Doc. 1-3 at 19] Although Plaintiff has a protected property interest in public education,

Plaintiff does not have a protected property interest in the "particular incidents of

education" that compose the "educational process." Seamons, 84 F.3d at 1235. Because

Plaintiff's Complaint only alleges that Plaintiff was deprived of particular incidents of

education, such as a health care plan, physical education program, and extracurricular

school activities, the Court concludes that the Complaint fails to allege a protectable

property or liberty interest under the Due Process Clause.

The analysis in Chavez v. Board of Education of Tularosa Municipal Schools, No.

CIV 05-380 JB/RLP, 2006 WL 4060667 at * 5 (D.N.M. Oct. 4, 2006) also supports this

conclusion. In Chavez, the autistic plaintiff claimed that he was deprived of his property

interest in public education due to the school's alleged failure to provide him with "a

public education comparable to his similarly situated peers without autism." Id. at * 1.

The Court rejected this claim, holding that the plaintiff had "failed to allege a deprivation of life, liberty, or property." Id. at * 5.

> If the Plaintiffs had alleged that Garcia affirmatively acted to exclude Matthew from school, such as by suspension or expulsion, the Court's decision might be different.  The Plaintiffs, however, rather than alleging that Garcia acted to deprive Matthew of his public education, argue that Garcia's omissions, namely her refusal to form a program to actively monitor and support Matthew's educational progress vis-à-vis his non-autistic peers, effectively amounted to a deprivation of due process because they kept Matthew from receiving special accommodation for his autism.  Because "the Due Process Clause 'generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual," Garcia's omissions did not violate Matthew's right to procedural due process.  Currier v. Doran, 242 F.3d 905, 917 (10th Cir. 2001) (quoting DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 196 (1989)).  As such, the Plaintiffs have not established that Matthew's right to procedural due process was violated.

Id.  As in Chavez, Plaintiff in the present case does not allege that Defendants affirmatively acted to exclude Johnny from school, rather he alleges that the failure to provide certain services amounted to a deprivation of due process.  Because "the Due Process Clause 'generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual," id., Plaintiff's due process claim fails.

To support his claim to the contrary, Plaintiff relies on Hairston v. Drosick, 423 F.Supp. 180, 184 (S.D.W.Va. 1976) and Cuyahoga County Ass'n for Retarded Children & Adults v. Essex, 411 F. Supp. 46 (N.D. Ohio 1976), which hold that the exclusion of a

33

handicapped child from a regular public classroom and placement in special education

classroom, without notice or opportunity for a hearing, violates the due process clause of

the United States Constitution.  Hairston does not cite any case law in support of its

conclusion and Cuyahoga relies solely on Goss.  As previously explained, the Tenth

Circuit has construed Goss narrowly, holding that "the innumerable separate components

of the educational process . . . do not create a property interest subject to constitutional

protection." Seamons, 84 F.3d at 1225.  Because Hairston and Cuyahoga conflict with

Tenth Circuit case law, they are not persuasive.

Plaintiff's reliance on Brookhart v. Illinois State Board of Education, 697 F.2d 179

(7th Cir. 1983) is misplaced.  In Brookhart, the plaintiff handicapped students challenged

a school district policy requiring that they pass a minimal competency test in order to

receive a high school diploma.  The Seventh Circuit Court of Appeals held that the

students had "a liberty interest sufficient to invoke the procedural protections of the due

process clause" because the "[d]enial of a diploma clearly affects a student's reputation"

and they had "a right conferred by state law to receive a diploma if they met the

requirements imposed prior to 1978: completion of seventeen course credits and

fulfillment of the State's graduation requirement."  Id. at 185.  Thus, the plaintiffs had

satisfied the "stigma plus" test necessary to establish the deprivation of a constitutional

liberty interest.  Plaintiff in the present case has not alleged that Defendants' actions

injured his reputation.  Nor has he alleged facts demonstrating that Defendants' actions

deprived him of a right previously afforded under state law.  Because the facts alleged in

Plaintiff's Complaint fail to satisfy the "stigma plus" test, Brookhart is distinguishable.

Likewise, Jackson v. Franklin County School Bd., 806 F.2d 623 (5th Cir. 1986) is distinguishable.  In that case, the handicapped plaintiff was suspended from school for three days for accosting his female classmates.  Id. at 625.  After his suspension, the plaintiff was informed that "this was not the best time for [him] to return to school."  Id. Plaintiff did not return to school that school year and in the fall of the next school year he was informed that he could not enroll until he had a new IEP and attended Youth Court. The Fifth Circuit Court of Appeals held that the plaintiff's exclusion from school for two months in the fall deprived the plaintiff of "his right to an education without ever giving written notice of cause, or providing a hearing."  Id. at 631.  In Jackson, the plaintiff was completely excluded from the educational process due to a disciplinary infraction, just like the plaintiffs in Goss.  Because Plaintiff in the present case was not completely excluded from the educational process due to a disciplinary infraction, Jackson is inapposite.

Plaintiff has failed to allege facts demonstrating that he was deprived of a constitutionally protected property or liberty interest and, therefore, his procedural due process claim must fail.  Accordingly, Defendants' motion for judgment on the pleadings of this claim will be granted.

2.  Substantive Due Process

"The due process clause of the Fourteenth Amendment prohibits executive abuse of power . . . which shocks the conscience."  Muskrat v. Deer Creek Pub. Sch., 715 F.3d 775 (10th Cir. 2013) (internal quotation marks and citation omitted).

> "Conduct that shocks the judicial conscience ... is deliberate
> government action that is arbitrary and unrestrained by the
> established principles of private right and distributive
> justice." Seegmiller v. LaVerkin City, 528 F.3d 762, 767
> (10th Cir. 2008) (quotations omitted). To show a defendant's
> conduct is conscience shocking, a plaintiff must prove a
> government actor arbitrarily abused his authority or
> "employ[ed] it as an instrument of oppression." Williams v.
> Berney, 519 F.3d 1216, 1220 (10th Cir. 2008). The behavior
> complained of must be egregious and outrageous.  Id.
> (substantive due process prohibits "only the most egregious
> official conduct") (quotations omitted); see also Uhlrig v.
> Harder, 64 F.3d 567, 574 (10th Cir. 1995) ("[T]he plaintiff
> must demonstrate a degree of outrageousness and a
> magnitude of potential or actual harm that is truly conscience
> shocking.").

Hernandez v. Ridley, 734 F.3d 1254, 1261 (10th Cir. 2013).

The facts alleged in Plaintiff's Complaint are not "egregious and outrageous" and, therefore, they do not "shock the conscience."  See , e.g., Muskrat, 715 F.3d at 787 (holding that the use of a time out room and alleged physical abuse (a pop on the plaintiff's head, holding the plaintiff's arm, and restraining plaintiff in his desk) did not shock the conscience); Abeyta By and Through Martinez v. Chama Valley Indep. Sch. Dist., No. 19, 77 F.3d 1253 (10th Cir. 1996) (holding that a teacher calling a student a prostitute over a month and a half period did not shock the conscience); Garcia by Garcia v. Miera, 817 F.2d 650 (10th Cir. 1987) (holding that beating a nine-year old girl with a paddle such that she bled and had bruises shocked the conscience).  Accordingly, the Court will grant Defendants' motion for judgment on the pleadings of Plaintiffs' substantive due process claim.[2]

---

[2]Therefore, the Court need not reach the issues of qualified immunity, supervisory liability, and

D.     _Claims against Defendants Delgado, Mutz, Quintana and Cavazos_

Defendants contend that the claims against Delgado should be dismissed because he is sued in his official capacity and, therefore, all claims against him are duplicative of the claims against the school district.  Additionally, Defendants contend that the claims against Mutz, Quintana, and Cavazos should be dismissed because they are entitled to qualified immunity.

1.  _Delgado_

Defendants contend that "Defendant Delgado should be dismissed because all claims against him are duplicative of all claims against the District."  [Doc. 37 at 45] Defendants point out that Delgado is sued in his official capacity and that the United States Supreme Court has held that "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  Kentucky v. Graham, 473 U.S. 159, 165-66 (1985).  Plaintiff responds, in relevant part, that he "has brought a common law claim against Defendant Delgado pursuant to the TCA" and that "[t]here is nothing in the TCA suggesting that naming a public employee and the entity who employs him is duplicative."  [Doc. 53 at 37]

Plaintiff has brought two claims against Delgado in his official capacity as superintendent of the Pojoaque Valley School District: (1) a violation of the New Mexico Tort Claims Act and (2) a violation of Section 1983.  For the reasons previously

---

failure to train.

explained, the Court will grant Defendants' motion for judgment on the pleadings of Plaintiff's Section 1983 claim, but deny the motion with respect to Plaintiff's New Mexico Tort Claims Act Claim.  Defendants fail to cite any authority indicating that official capacity suits are duplicative under the New Mexico Tort Claims Act and, therefore, the named official must be dismissed.  As previously explained, "[j]udgment on the pleadings is appropriate only when the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." Sanders, 689 F.3d at 1141 (internal quotation marks and citation omitted).   Defendants have failed to establish that they are entitled to judgment as a matter of law with respect to Delgado and, therefore, their motion will be denied.

2.  *Mutz, Quintana, and Cavazos*

Defendants contend that "Mutz, Quintana and Cavazos are entitled to Qualified Immunity on all claims brought against them in their official capacity."  [Doc. 37 at 42] Plaintiff has brought two claims against Mutz, Quintana and Cavazos: (1) a violation of the New Mexico Tort Claims Act and (2) a violation of Section 1983.  For the reasons previously explained, the Court will grant Defendants' motion for judgment on the pleadings of Plaintiff's Section 1983 claim for failure to allege facts establishing a constitutional violation, but deny the motion with respect to Plaintiff's New Mexico Tort Claims Act Claim.  This raises the question:  are Mutz, Quintana and Cavazos entitled to qualified immunity on Plaintiff's New Mexico Tort Claims Act claim?

The parties do not address this issue in their briefing.  The New Mexico Supreme Court has stated that:

> Whether the doctrine of qualified immunity protects an official from an action brought under the Tort Claims Act is an open question. The Act was passed prior to the genesis of the modern qualified immunity law established in Harlow. Further, qualified immunity has developed as a defense to § 1983 actions and to corresponding actions against federal officials under Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). See, e.g., Anderson, 483 U.S. at 637, 107 S.Ct. at 3037–38 ( Bivens action against FBI agent); Mitchell, 472 U.S. at 513, 105 S.Ct. at 2808–09 ( Bivens action against United States for warrantless wiretap); Carrillo, 114 N.M. at 609, 845 P.2d at 132 (Section 1983 action).  In this case both parties assumed that qualified immunity does protect officials from actions brought under the Tort Claims Act and, as a result, did not argue in the trial court whether the doctrine of qualified immunity from suit under § 1983 applies to liability for which immunity is specifically waived under the Tort Claims Act. Although we question the parties' assumption, we will not address the question here because it is not properly before us.

Romero v. Sanchez, 895 P.2d 212, 218 (N.M. 1995).  In Todd v. Montoya, 877 F.Supp.2d 1048, 1106 (D.N.M. 2012), the Court held, based on Romero and case law from our sister circuits, that "qualified immunity does not apply to claims brought under the NMTCA."

In light of the foregoing case law, the Court concludes that Mutz, Quintana and Cavazos are not entitled to qualified immunity on Plaintiff's New Mexico Tort Claims Act claim.

E.  *Joint Motion to Consolidate and For Further Relief as Described Herein* [Doc. 34]

Defendants seek to consolidate the present case with Plaintiff's IDEA appeal in *Johnny S. v. Pojoaque Valley School District, et al.*, 13-CV-145 RHS/ACT.  Plaintiff does "not necessarily oppose consolidation of the civil rights case and the IDEA appeal in

terms of ruling on the merits," but objects because the stay imposed in the present case may delay the disposition of Plaintiff's IDEA appeal.

Rule 42(a) of the Federal Rules of Civil Procedure provides that "[i]f actions before the court involve a common question of law or fact, the court may . . . consolidate the actions."  Consolidation is within the District Court's sound discretion.  See Shump v. Balka, 574 F.2d 1341, 1344 (10th Cir. 1978).

> In assessing whether consolidation is appropriate in given circumstances, a district court should consider both equity and judicial economy. However . . . efficiency cannot be permitted to prevail at the expense of justice-consolidation should be considered when savings of expense and gains of efficiency can be accomplished without sacrifice of justice.

DeMarco v. DeMarco, 11-CV-1068 MCA-WDS, Doc. 6 (D.N.M. Dec. 6, 2011) (quoting Devlin v. Transp. Commc'ns Int'l Union, 175 F.3d 121, 130 (2d Cir. 1999)).  "Thus, once the Court determines there is a common question of law or fact, which is Rule 42's predicate requirement, the Court weighs the interest of judicial economy against any potential for delay, confusion, or unfair prejudice that consolidation might cause."  Id.

The parties agree that the two actions involve common questions of law and fact, as well as common parties.  The parties disagree, however, whether consolidation would be efficient, given that the present case has been stayed pending resolution of *Defendants' Motion for Judgement on the Pleadings and For Qualified Immunity and Memorandum in Support Thereof* [Doc. 37], while in the IDEA appeal "a scheduling conference has already occurred and discovery is proceeding and on track."  [Doc. 58 at 3]  Plaintiff points out that "the IDEA appeal concerns equitable relief for a special

40

education student" and argues that "the IDEA appeal should proceed without delay."

As Plaintiff points out, discovery in the present case has been stayed pending resolution of *Defendants' Motion for Judgement on the Pleadings and For Qualified Immunity and Memorandum in Support Thereof*. [See Doc. 52]  However, now that the Court has ruled on Defendants' motion, the stay will be lifted.  Although discovery has barely commenced in the present case, discovery in the IDEA appeal is well under way.  Indeed, as of the date of this *Memorandum Opinion and Order*, discovery is closed and the parties' dispositive motions deadline is April 25, 2014.  [See Doc. 68].

The Court concludes that consolidation would cause delay and unfair prejudice to Plaintiff.  Plaintiff's IDEA appeal is well on its way to resolution, whereas the present case has barely begun.  Once the two cases are consolidated, they become one and a scheduling order in the present case would delay disposition of Plaintiff's IDEA appeal.  Such a delay may be prejudicial Plaintiff, since he is seeking equitable relief in the form of special education services, the delay of which may hinder Plaintiff's physical, social and educational development.  Accordingly, given the different procedural posture of the two cases, the Court will deny the *Joint Motion to Consolidate and For Further Relief as Described Herein* [Doc. 34].

## IV.   CONCLUSION

For the foregoing reasons, *Defendants' Motion for Judgement on the Pleadings and For Qualified Immunity and Memorandum in Support Thereof* [Doc. 37] will be denied with respect to Plaintiff's New Mexico Tort Claims Act and Section 504/ADA claims, but granted with respect to Plaintiff's Section 1983 claim.  The parties *Joint*

*Motion to Consolidate and For Further Relief as Described Herein* [Doc. 34] will be denied.

**IT IS THEREFORE HEREBY ORDERED** that *Defendants' Motion for Judgement on the Pleadings and For Qualified Immunity and Memorandum in Support Thereof* [Doc. 37] is **GRANTED IN PART AND DENIED IN PART**;

**IT IS FURTHER ORDERED** that the *Joint Motion to Consolidate and For Further Relief as Described Herein* [Doc. 34] is **DENIED**.

**IT IS FURTHER ORDERED** that the stay of proceedings imposed by the Court in the *Order* filed on June 13, 2013 [see Doc. 52] is hereby **LIFTED**.

**SO ORDERED** this 31st day of March, 2013 in Albuquerque, New Mexico.

M. CHRISTINA ARMIJO
Chief United States District Judge